## INMAN v. BROOKMAN et al.

Under Civ. Code, § 1740, providing that every general partner has authority to do whatever is necessary to carry on such business in the ordinary manner, and for this purpose may bind his copartners by an agreement in writing, a partner had authority to authorize a clerk employed by it to execute a note in the firm name to obtain money for use in the firm business.

If one of a firm had authority to borrow money for the firm, that the other partners had no knowledge of the loan until long thereafter would not preclude them from being liable on the note as copartners.

(Opinion filed, December 11, 1911.)

Appeal from Circuit Court, Clay County.   Hon. R. B. Tripp, Judge.

Action by D. M. Inman against E. D. Brookman and others. From a judgment for plaintiff, and an order denying a motion for a new trial, certain defendants appeal.   Affirmed.

*Payne & Olson* and *Thomas Sterling,* for appellants.   *John L. Jolley* and *French & Orvis,* for respondent.

CORSON, J.   This is an appeal by the defendants E. D. and S. E. Brookman and John R. Barrett from a judgment entered in favor of the plaintiff and from the order denying a new trial.   It is alleged in the complaint, in substance, that the above-named defendants, with Robert L. Wight, on the 23d day of September, 1903, and for a number of years prior and subsequent thereto, were copartners doing business at Vermilion and at De Smet, in the state of South Dakota, under the firm name and style of the

Vermilion-De Smet Milling Company. It is further alleged that on the said 23d day of September, 1903, the defendants, by E. J. Wight, their agent thereunto authorized, made and delivered to the First National Bank of Vermilion their promissory note, bearing date of said day, whereby they promised to pay to the First National Bank of Vermilion, January 1, 1904, $2,000, with interest at the rate of 8 per cent. per annum until paid. It is further alleged that before the commencement of this action said note was indorsed and transferred to the plaintiff, and that certain payments, specifying them, were made thereon, and the plaintiff demands judgment against the defendants for the sum of $1,766.25, with interest on $1,991.25 at 8 per cent. per annum, and costs.

The three appealing defendants by their answer admit the allegation that they and Robert L. Wight were partners as alleged in the complaint, deny that Elmer J. Wight was authorized by the defendants to make and deliver the promissory note described in the complaint, and make the statutory denial of the other allegations as to the payments made and balance due alleged in the complaint. The defendant Robert L. Wight interposed no answer to the complaint, and the court directed a verdict as against him and defendant Barrett, and the jury, under the instructions of the court, found in favor of the plaintiff and against all the defendants.

It is disclosed by the evidence that the firm, consisting of the four persons named, was engaged in the milling business both at Vermilion and De Smet; that three of the partners resided at Vermilion; that the business at De Smet was conducted by John R. Barrett, who resided at De Smet, and Elmer J. Wight, son of the partner Robert L. Wight; that in September, 1903, the son, Elmer J. Wight, went to Vermilion and had a conversation with his father, Robert L. Wight, in relation to obtaining further means for carrying on the business at De Smet, at which time the father states what occurred as follows: "He (Elmer J. Wight) came down from De Smet on the 23d day of September, 1903, and said they needed more money at De Smet for buying grain for the milling business, for milling purposes, etc.; and he suggested to

me he thought he could get it of Inman's bank, and I told him, 'All right,' he could go down and get it and sign the firm name. * * * He was working at De Smet in the milling business, and John R. Barrett, a member of the same firm, was working there. S. E. Brookman and Edgar Brookman were in charge of the business of the Vermilion-De Smet Milling Company at Vermilion. I never had any immediate control of the business at De Smet, and never worked up there any. The Vermilion-De Smet Milling Company did business at De Smet with the De Smet National Bank."

In regard to the transaction Elmer J. Wight testified as follows: "I am the son of Robert L. Wight, and was living in September, 1903, at De Smet, S. D., and working for the Vermilion-De Smet Milling Company. The company banked with the De Smet National Bank. I first saw Exhibit B, being a note for $2,000, September 23, 1903. I signed the name, 'Vermilion-De Smet Milling Company, by E. J. Wight, a Member of the Firm.' * * * I left Exhibit B, when I signed it, at the First National Bank in Vermilion, and I got that draft, Exhibit C, for it. I took that draft with me to De Smet and deposited it in the De Smet National Bank. * * * I left it [the draft] at the bank, the De Smet National Bank. The name 'E. J. Wight,' written across the back of the draft, Exhibit C, is in my handwriting. It is my name. I left the draft, with a deposit slip, in the De Smet National Bank. * * I know John R. Barrett. He was at De Smet, S. D.., at the time I got this money at Vermilion and made this deposit at De Smet. I had talked with John R. Barrett about borrowing money from Inman's bank before borrowing that money. The talk was the day before I came down here. * * * Mr. Barrett and I were talking about needing more money in the business, and I suggested to John that perhaps we could get it from Inman at Vermilion, and he said, 'You go down and see if you can get it.' * * * Q. You say it was checked out? A. Checked out. The checks were issued by the Vermilion-De Smet Milling Company, and that name was signed to the checks. John R. Barrett and myself used to draw checks during the month of September, 1903, and did all the time we were there."

[1] Numerous errors are assigned as to the admission and rejection of evidence, and the instructions of the court; but the correctness of these rulings depends on the view we take of the case as to the authority of Elmer J. Wight to sign the firm name to the note sued upon, under the direction of his father, a member of the firm, and the direction of Barrett, another member of the firm, and in view of his position and manner of conducting the business in connection with Barrett at De Smet. It is contended by the plaintiff, in support of the judgment of the trial court, that E. J. Wight, by the authority vested in him by R. L. Wight and John R. Barrett, two of the partners, was fully authorized to borrow the $2,000 and sign the name of the firm to the note, and that, the money being applied to the business of the milling company, all of the partners became thereby liable for the payment of said note. This contention is controverted by the appealing defendants, who contend that while Robert L. Wight, as a partner, would have been authorized to borrow the money and execute, in the firm name, the note sued upon in this action, he could not, as such partner, delegate the authority to his son, Elmer J. Wight, and that the other defendants, therefore, were not liable upon the note.

We are inclined to take the view that the plaintiff is right in his contention, and that Robert L. Wight, as one of the partners, was not only authorized to borrow the money and sign the firm name, but that his authority as such partner enabled him to confer authority upon Elmer J. Wight to borrow money and execute the note in the name of the firm, and that thereby all the partners became liable for the payment of the same. Section 1740, C. C., provides: "Every general partner is agent for the partnership in the transaction of its business, and has authority to do whatever is necessary to carry on such business in the ordinary manner, and for this purpose may bind his copartners by an agreement in writing."

This section embodies substantially the common law upon the subject of the authority of partners, and is a copy of section 1300 of the Civil Code as proposed by the code commissioners of New

York. The commissioners in their note to that section cite a number of English cases and one American case, Wilkins v. Pearce, 5 Denio (N. Y.) 541, as the basis for the section, and the latter case seems to be a leading case upon the subject as to the powers vested in partners. In that case that learned court says: "By the act of entering into a copartnership, each of its members becomes clothed with full power to make any and every contract within the scope and limits of the partnership business. All such contracts will therefore be absolutely binding upon the several members. This power is incident to the partnership relation, and must exist, in defiance of expostulations and objections, while the relation endures." It appears in that case that one of the copartners dissented from an agreement which one of the partners was making to indemnify a third person for accepting for the accommodation of the firm a draft drawn upon him by such partner, and it was contended by the defendant in that case that inasmuch as he objected to his partner entering into the agreement at the time it was made, the agreement was not binding upon him and he was not liable under it. The court, however, held that he was bound by the agreement, notwithstanding his dissent at the time the agreement was entered into.

It is said in 30 Cyc. p. 508, by the learned author, under the head of Partnership: "One partner has implied authority to appoint an agent to make and indorse negotiable paper for the firm" —citing a number of authorities. To the same effect is Mechem on Agency, §§ 45, 70. In the late case of Parker v. Parker, 80 S. W. 209, it was held by the learned Court of Appeals of Kentucky that "a member of a firm, having authority to borrow money for its benefit, has authority to direct another to borrow money for it." In its opinion the court says: "The evidence tends to show that Miss Dora Farris conducted the business of the firm at their office in London, Ky. She made the deposits in bank and drew the firm's checks thereon. The firm's name was signed to the note by Miss Farris. She was requested by Ed Parker to borrow money from his wife for the firm, which she did, and signed the firm's name to the note. The money was used in the

business and for its benefit. As a member of the firm, Ed Parker had the right to borrow the money to be used for the benefit of the firm. Consequently he had the right to direct an agent of the firm to do so for it."

In Tillier v. Whitehead, 1 Dall. 269, 1 L. Ed. 131, in which there was a feigned issue to try whether the defendant had a legal authority to use plaintiff's name in the acceptance, drawing, and indorsement of bills of exchange and promissory notes, the court in its opinion says: "With respect to the second question, it was unanimously resolved by the court that one of two partners may give an authority to a clerk under the firm name of the house, and that the clerk may, in consequence thereof, accept bills and sign or indorse notes in the name of the company. And it was said by McKean, Chief Justice, that this case could not be properly compared with the case of an attorney without power of substitution; for the attorney cannot exceed the letter of his authority, being nothing more than an agent himself. But each partner is a principal; and it is implied in the very nature of their connection that each has a right to depute and appoint a clerk to act for both, in matters relative to their joint interest." The Supreme Court of Alabama, in the late case of Morris v. First National Bank of Sampson, 162 Ala. 301, 50 South. 137, held, as appears by the headnote: "Where checks constituting an overdraft were drawn on the firm bank account by the bookkeeper of the firm, under the direction of one of the partners, and paid by the bank, each member of the firm was liable to the bank, though the checks were for the individual debt of the partner at whose instance they were drawn, and though the other partner had instructed the bookkeeper to draw no checks, except for firm purposes."

[2] It clearly appears from the evidence in this case that the money obtained upon the note in controversy was used in the firm business at De Smet by both the partner, Barrett, and the clerk, Elmer J. Wight. It may be conceded that E. D. and S. E. Brookman, the two partners residing in Vermillion, had no knowledge of the borrowing of this money and execution of this note until a long time after the same had been borrowed and used by the firm;

but this want of knowledge on their part did not in any manner affect their liability for the payment of the note as such copartners. Robert L. Wight, being authorized as a partner to borrow money and execute a note for the firm, was, as we have seen under the authorities, authorized as a member of the firm to confer the authority upon his son, Elmer J. Wight, and, having done so, the jury was clearly right in finding a verdict against E. D. and S. E. Brookman, as well as against Barrett and Wight

In our view it is unnecessary in this opinion to review the various rulings of the court in the admission and rejection of evidence, as it is quite clear that much of the evidence attempted to be introduced by the defendants was clearly immaterial, and its exclusion, therefore, did not in any way prejudice the defendants. And we are of the opinion that the evidence introduced on the the part of the plaintiff, which was objected to by the defendants, was clearly competent and admissible for the purpose of showing that the money so borrowed, and for which the note was executed, was used in the business of the firm at De Smet, and, under the view we have taken in the case, that in the instructions of the court the law applicable to the case was correctly stated to the jury.

As before stated, the plaintiff and defendants tried the case upon entirely different theories of the law. The plaintiff's theory is embodied in the instruction of the court, which is as follows: "As I have also stated, the undisputed evidence shows that the young man went and got the money, gave this firm note here in suit, and the avails of that note went into the bank deposit of and was used by that firm there at De Smet; so, in view of this undisputed evidence it is your duty, under the law applicable to this case, to look upon that note just the same as if it had been given by the partner, Robert L. Wight, to the bank." The defendants' theory is embodied in the instructions requested by them and refused by the court, the material part of which is as follows: "That, while each or any of the partners in the partnership business in which the defendants were engaged might for the purposes of the business himself borrow money and give the firm or partnership

note therefor, upon which the several partners would be bound, yet no one of the partners, or any number of the partners less than a majority, acting as agent or agents of the firm, could authorize a third person as subagent to borrow money, and that, although you shall believe from the evidence in this action that Robert L. Wight or John R. Barrett told Elmer J. Wight, the agent at De Smet, that he might or should borrow money represented by the note in controversy in this action at the First National Bank in Vermillion, such authority thus attempted to be conferred upon Elmer J. Wight by said Robert L. Wight or John R. Barrett would not be binding upon the other members of the firm as an original authority, and, in order that the other members of the firm might be bound thereby, it must be shown by the evidence that they subsequently ratified the authority attempted to be given."

The attorneys for the plaintiff, on their theory of the case, introduced evidence tending to prove the authority conferred upon the agent, Elmer J. Wight, to borrow the money and execute the note in controversy, and that the money so borrowed was required and used in the regular partnership business at De Smet for the benefit of the firm. The defendants, on the other hand, introduced evidence tending to prove that E. D. and S. E. Brookman did not authorize Elmer J. Wight to borrow the money or execute the note, and did not know of the existence of the same until some time after its execution. The plaintiff objected to this evidence on the part of the defendants E. D. and S. E. Brookman, for the reason that it was incompetent and immaterial, as the evidence, if admitted, would constitute no defense to the action.

Under the theory contended for by the plaintiff, and adopted by the court, such evidence was clearly inadmissible, as we are of the opinion that the law as contended for by the plaintiff, and as ruled by the court in its instructions to the jury, was correctly stated by the court. Evidence was admitted, however, on the part of the defendants, tending to prove that the resources at De Smet were such that it was not necessary to borrow for the purpose of carrying on the business there, and the court instructed the jury

as follows: "You are further instructed that a general partner, as agent for the partnership in the transaction of its business, has authority only to do what is necessary to carry on the business of the partnership in the ordinary manner; and unless you believe from the evidence that the giving of the note in controversy in this action was necessary for carrying on the business in which the defendants, as partners, were engaged in an ordinary manner; then neither the defendant Robert L. Wight nor the defendant John R. Barrett would have had authority to borrow the money and give the note in controversy in this action, so as to bind the defendants E. D. Brookman and S. E. Brookman, and could not have authorized Elmer J. Wight to borrow such money and give such note." The jury by their verdict evidently found that the borrowing of this money was necessary for the carrying on of business under the evidence in the case, and their finding on that question is conclusive in this court.

No useful purpose, therefore, would be served in considering and discussing the various objections and exceptions taken to the rulings of the court in the admission of the evidence on the part of the plaintiff, or in considering and discussing the various objections and exceptions of the defendants to the rulings of the court in the exclusion of the evidence sought to be introduced on the part of the defendants, as the correctness of these rulings necessarily follows the conclusions of the court as to the law applicable to the case.

The judgment of the circuit court and order denying a new trial are affirmed.

WHITING, J., took no part in this decision.